1
2
3
4
5
6
7

8      UNITED STATES DISTRICT COURT

9      NORTHERN DISTRICT OF CALIFORNIA

10     San Francisco Division

11  IRMA FRAUSTO, on behalf of herself and        Case No. 18-cv-01983-LB
    all others similarly situated
12
                  Plaintiffs,
13                                                **ORDER CERTIFYING RULE 23(b)(3)**
                                                  **CLASS**
    v.
14                                                Re: ECF No. 90
    BANK OF AMERICA, NATIONAL
15  ASSOCIATION,

16                Defendant.
    ARIANNA SUAREZ, on behalf of herself          Case No. 18-cv-01202-LB
17  and all others similarly situated,

18                Plaintiff,

19  v.

20  BANK OF AMERICA CORPORATION,
    Defendant.
21

22

23                        **INTRODUCTION**

24        The plaintiffs both worked for Bank of America as non-exempt employees and — on behalf of

25  themselves and the putative class — sued for alleged wage-and-hour violations under the

26  California Labor Code for off-the-clock work and missed meal-and-rest breaks. They also made

27  derivative claims predicated on the off-the-clock work and missed-breaks claims: failure to pay

28  final wages on time, failure to provide accurate wage-and-hour statements, and unfair business

practices under California's Unfair Competition Law ("UCL"). The court grants the motion in part and certifies the following narrowed classes: (1) for the off-the-clock claim, (a) all Treasury Services Advisors and persons with similar job duties (in call centers) and (b) all Assistant Managers and persons with similar job duties (in financial centers); and (2) for the meal-and-rest-breaks claims, all Treasury Services Advisors and persons with similar job duties (in call centers). The court certifies the same classes for the derivative claims for the reasons that it certifies classes for the predicate claims.

## STATEMENT

### 1. The Plaintiffs, Their Jobs and Class Claims, and Their Proposed Class

Ms. Frausto worked in a call center as a Treasury Services Advisor from 1999 to 2017 and spent her day fielding calls from commercial clients, financial centers, and other business partners, and (generally) verifying wires, the amount of cash in vaults, and information about accounts.[1] Ms. Suarez worked from 2003 to 2016, first as a teller, then as a Teller Operations Specialist and a Client Services Specialist, and starting in 2015, as an assistant manager.[2]

Following the court's summary-judgment orders, the *Frausto* complaint has two stand-alone class claims: (1) claim two charging a failure to provide meal breaks, in violation of the California Labor Code, and (2) claim three charging a failure to provide rest breaks, in violation of the Labor Code. It has three class claims predicated on claims two and three: (3) claim four charging a failure to pay final wages on time, in violation of the Labor Code, (4) claim five charging a failure to provide accurate wage-and-hour statements, in violation of the Labor Code, and (5) claim six

---

[1] Summary-Judgment Order – ECF No.122 at 2–3 (citing Frausto Dep. – ECF No. 99-3). Citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents. Unless otherwise specified, this order cites the *Frausto* docket, No. 3:18-cv-01983-LB.

[2] Suarez Dep., No. 3:18-cv-01202-LB – ECF No. 71-1 at 43 (pp. 40:4–6), 113 (p. 110:2–8), 322 (p. 319:16–21), 364 (p. 361:18–21). Ms. Suarez was on medical leave from October 2016 until she was terminated about a year later. *Id.* at 322 (p. 319:16–21), 337 (p. 334:4–6).

charging unfair business practices, in violation of the UCL.[3] The complaint's class definition is as follows:

> All persons who worked for any Defendant in California as a non-exempt employee at any time during the period beginning four years before the filing of the initial complaint in this action and ending when notice to the Class is sent.[4]

The *Frausto* complaint has the following subclasses:

> **Meal Period Premium Sub-Class:** All persons who worked for any Defendant in California as a non-exempt employee at any time during the period beginning four years before the filing of the initial complaint in this action and ending when notice to the Class is sent and received from any Defendant payment for a bonus and a missed meal period.
>
> **Late Pay Sub-Class:** All persons who worked for any Defendant in California as a non-exempt employee at any time during the period beginning three years before the filing of the initial complaint in this action and ending when notice to the Class is sent and terminated their employment with any Defendant.[5]

The *Suarez* complaint has three stand-alone class claims: (1) claim one for overtime wages, (based on work "off the clock"), in violation of the Labor Code; (2) claim two, charging a failure to pay minimum wage (based on the overtime violations),[6] in violation of the Labor Code; and (3) claim three, charging a failure to provide meal-and-rest breaks, in violation of the Labor Code.[7] It has four class claims predicated on claims one through three: (4) claim five, charging a failure to pay vacation time at termination, in violation of the Labor Code (a claim that is not at issue in the class-certification motion); (5) claim six, charging a failure to pay final wages on time, in violation of the Labor Code; (6) claim eight, charging a failure to provide accurate wage-and-hour

---

[3] *Frausto* First Amended Complaint ("FAC") – ECF No. 24 at 15–24 (¶¶ 32–84). The court granted summary-judgment to Bank of America on the overtime-pay claim, which was predicated on Bank of America's excluding certain bonuses from the wage rate, on the ground that the bonuses were discretionary and not part of regular pay. Summary-Judgment Order – ECF No. 122 at 9–12.

[4] *Frausto* FAC – ECF No. 24 at 11 (¶ 24).

[5] *Id.* at 11–12 (¶ 25).

[6] The overtime claim may be derivative of the minimum-wage claim. *See Kang v. Wells Fargo Bank, N.A.*, No. 17-cv-06220-BLF, 2019 WL 468818, at *5 (N.D. Cal. Feb. 9, 2019).

[7] *Suarez* First Amended Compl. ("FAC"), No. 3:18-cv-01202 – ECF No. 16 at 17–23 (¶¶ 51–89).

statements, in violation of the Labor Code; and (7) claim twenty, charging unfair business practices, in violation of the UCL.[8]

The *Suarez* complaint has the following class definitions:

> All non-exempt employees who worked for Bank of America as Assistant Manager or similar job titles, in the State of California at any time on or after the date that is four years prior to when the Complaint was filed.
>
> <u>Terminated Subclass:</u> All persons who are eligible for membership in the Class but who are no longer employed by Defendant.[9]

In their joint class-certification motion, the plaintiffs ask to certify the following class:

> All persons who worked for Defendant Bank of America, National Association in California as a non-exempt employee at any time during the period beginning on February 22, 2014 and ending when the Court grants class certification, but expressly excluding therefrom any individuals who, as of the date the Court grants class certification, (a) have filed their own separate action as a named plaintiff alleging any of the same claims alleged by Plaintiffs, (b) have opted into a collective action or are class members in a certified class action against Defendant alleging any of the same claims alleged by Plaintiffs, and/or (c) have previously released all claims against Defendant being alleged by Plaintiffs.[10]

## 2.  The Plaintiffs' Submissions About the Alleged Labor Code Violations

The plaintiffs do not contend that Bank of America had non-compliant overtime and meal-and-rest break policies and instead assert that it did not follow its policies.[11] Their submissions in support of their class-certification motion include the following: (1) declarations and testimony from witnesses; (2) a plan to conduct a survey and use statistical sampling to establish whether Bank of America's policies and practices resulted in Labor Code violations; and (3) expert

---

[8] *Id.* at 24–25 (¶¶ 98–105), 45–46 (¶¶ 226–236). The class-certification motion asks to certify classes only for the overtime and meal-and-rest-breaks claims, not the vacation-time claim. Mot. – ECF No. 90 at 11.

[9] *Suarez* FAC, No. 18-cv-01202 – ECF No. 16 at 8 (¶ 30).

[10] Mot. – ECF No. 90 at 3.

[11] *Id.* at 12.

analysis of timekeeping, payroll, phone, and work-schedule records to identify any violations and calculate damages.[12]

### 2.1 Declarations and Testimony

The plaintiffs submitted declarations from 64 class members.

Ms. Frausto estimated that she worked overtime approximately once a week.[13] Ms. Suarez estimated that she worked overtime approximately two to three days per week.[14] 62 other class members submitted declarations too.[15] They had various non-exempt jobs (such as relationship banker, personal banker, mortgaging-servicing specialist, teller, sales-and-services specialist, customer-service representative, sales-service associate, assistant branch manager, operations manager, short-sale specialist, customer-service chat agent and phone agent, loan coordinator, Financial Center loan officer, small-business consultant, workforce-management analyst and liaison, collector and intake specialist, negotiator, Doc Drawer, and senior work-out specialist).[16] In their declarations, they reported that (1) they worked overtime hours (in the form of off-the-clock work before or after they logged in for their shifts) and were routinely denied 30-minute uninterrupted duty-free meal breaks and 10-minute uninterrupted rest periods, (2) managers knew that they worked through their meal-and-rest breaks, (3) performance goals and deadlines required them to miss their breaks and work overtime, resulting in the equivalent of a Bank of America policy that did not allow employees to take meal-and-rest break and required overtime; and (4) employees clocked in and out of a computerized system for the start and end of their daily shifts and meal-and-rest breaks.[17] The plaintiffs' evidence chart summarizes the evidence in the

---

[12] *Id.* at 12–15.

[13] Frausto Decl. – ECF No. 90-1 at 3 (¶ 3).

[14] Suarez Decl. – ECF No. 90-2 at 2–3 (¶ 6).

[15] Index – ECF No. 109-1 at 3–5.

[16] The next footnote cites representative declarations from employees who have these jobs.

[17] *See generally* Declarations – ECF No. 109-1 at 7–394; *see, e.g.*, Acosta Decl. – ECF No. 109-1 at 8 (¶ 4), 9 (¶ 7); Alvarez Decl. – ECF No. 109-1 at 20 (¶ 3), 21–22 (¶¶ 8–13) (worked off-the-clock on a daily basis to meet required productivity goals and was denied meal breaks daily and rest breaks four days a week, all because Bank of America and managers demanded that tasks be done on deadlines that necessitated work during meal-and-rest breaks); Avazan Decl. – ECF No. 109-1 at 26 (¶¶ 3–4),

declarations by pin cite, including the following facts: (1) employees were routinely denied 30-minute meal breaks; (2) employees were routinely denied 10-minute uninterrupted rest periods; (3) employees clocked in and out at the start and end of their daily shifts and meal-and-rest breaks; (4) employees received warning messages from the computer systems when they tried to insert less than a 30-minute meal break; (5) Bank of America's timekeeping system and warning system forced employees to record 30 minutes for a meal break, even when they did not take it; (6) Bank of America's practices amounted to a policy of not allowing employees to take meal-and-rest breaks; (7) employees worked more than eight hours a day or 40 hours a week; and (8) Bank of America required or pressured employees to work off-the-clock and forego breaks.[18] This meant that Bank of America did not pay all final wages to terminated employees or give them accurate wage statements.[19]

In her deposition testimony, Ms. Frausto said (among other things) that she (1) worked off the clock for around ten minutes when she booted up her computer in the morning (so that she could

---

27–29 (¶¶ 7, 9–16); Bolin Decl. – ECF No. 109-1 at 52 (¶ 3), 53–54 (¶¶ 7–12); Ceapa Decl. – ECF No. 109-1 at 63–64 (¶ 7) (off-the-clock work three times a week after logging out); Davisson Decl. – ECF No. 109-1 at 87 (¶ 3), 88–89 (¶¶ 8–11); Garmo Decl. – ECF No. 109-1 at 124–127 (¶¶ 3, 7, 9–18) (issues included not getting the second 30-minute break on days when she worked more than 10 hours; computerized system recorded the time clocked in and out for the day and for meal periods; off-the-clock work); Jovanovich Decl. – ECF No. 109-1 at 180 (¶ 3), 181–184 (¶¶ 7, 11–19); McFadden Decl. – ECF No. 109-1 at 214 (¶ 3), 215–217 (¶¶ 7–17); Meza Decl. – ECF No. 109-1 at 220 (¶¶ 4–5), 221–223 (¶¶ 8, 11–18); Mo Decl. – ECF No. 190-1 at 227 (¶ 3), 228–30 (¶¶ 10–18); Rahimi Decl. – ECF No. 109-1 at 278–281 (¶¶ 3–4, 6–9, 12–18) (former assistant Vice President (exempt) and current small-business consultant (non-exempt); overtime approximately two or three times a week; forced to shorten meal breaks frequently and routinely; has not taken a single rest break since starting as a non-exempt employee; cannot clock back into system less than 30 minutes into a meal break; understood that three warnings would result in discipline and felt compelled to report that she took a 30-minute meal break even when she did not; from her perspective, Bank of America has adopted a policy of demanding work through meal-and-rest breaks, as is shown by managers who require completion of tasks on deadlines that require working through meal-and-rest breaks); Leflore Severe Decl. – ECF No. 109-1 at 296–298 (¶¶ 3, 5, 7–12); Smith Decl. – ECF No. 109-1 at 308–310 (¶¶ 3, 6–13); Smith Decl. – ECF No. 109-1 at 313 (¶ 3), 314–317 (¶¶ 6–17) (worked off the clock to attend meetings and greet customers, making it difficult to complete regular duties as loan officer, and resulting in a need to work at home on many evenings and skip meal-and-rest breaks; overtime approval process was so onerous that it was almost impossible to obtain approval); Swartout Decl. – ECF No. 109-1 at 320 (¶¶ 3–4), 321 (¶ 7), 322–323 (¶¶ 11–17); Woods Decl. – ECF No. 109-1 at 378–380 (¶¶ 3, 5, 7–12).

[18] Plaintiffs' Evidence Chart, Ex. A to Marquez Decl. – ECF NO. 90-3 at 11–16.

[19] *Id.* at 15–16.

start handling calls when her shift started at 6 a.m.), (2) was told that she could not log in earlier than 6 a.m. to the timekeeping system and had to start by 6 a.m., (3) was too intimidated to report off-the-clock work, (4) was told to be available at all times to take calls (resulting in missing meal-and-rest breaks), (5) told her managers about the problems with the call volume and was told (among other things) that "[i]t is what it is" and "do the best you can," and (6) logged off the computer system after she logged off the timekeeping system (a process that took two to five minutes before she could leave for the day).[20] She acknowledged that Bank of America's policies required her to take her breaks, but she missed breaks six to eight times a week.[21]

In her deposition testimony, Ms. Suarez said (among other things) that she (1) could not clock in at the time when she actually started and instead had to clock in at the precise start time of her shift, (2) she logged times when she did not take a lunch or rest break, and management would not approve her time sheet unless she "unchecked" the box reporting the missed break, (3) only management could approve overtime, and they did not, and (3) she was unable to take meal breaks, which were interrupted every day (when she was working at certain locations).[22]

Rest breaks are not recorded in Bank of America's time-keeping system.[23] If non-exempt employees want to ask for pay for missed meal or rest breaks, they have to call Employee Relations (essentially, HR).[24]

### 2.2 Survey Evidence

Jon Krosnick, Ph.D., a Stanford professor, will conduct a survey and use statistical sampling to evaluate the alleged Labor Code violations.[25] He describes the process for the survey: (1) draw a

---

[20] Frausto Dep., Ex. B to Marquez Decl. – ECF No. 90-3 at 25–27 (pp. 60:1–67:9), 31–33 (pp. 92:5–96:15), 34–37 (pp. 102:5–105:10), 38–40 (pp. 109:3–111:16), 40–43 (pp. 111:22–114:20), 48–49 (pp. 136:1–137:23), 50 (p. 141:2–24), 51–53 (pp. 145:18–147:21), 54–55 (pp. 154:1–155:19), 56–57 (pp. 157:3–158:11).

[21] *Id.* at 46–47 (pp. 134:1–135:23).

[22] Suarez Dep., Ex. 1B to Ilg Decl. – ECF No. 90-4 at 40 (p. 135:1–13), 41 (p. 136:4–25), 42–44 (pp. 143:25–145:23), 45–48 (pp. 140:2–152:24), 49–50 (pp. 193:3–194:24), 55–56 (pp. 216:20–217:24), 57 (p. 227:2–8), 58–61 (pp. 229:21–232:23).

[23] Becker Dep., Ex. A to Ilg Decl. – ECF No. 90-4 at 11 (p. 23:5–9).

[24] *Id.* at 21–23 (pp. 51:15–53:21)

[25] *See* Mot. – ECF No. 90 at 14; Reply – ECF No. 120 at 15; Krosnick Report – ECF No. 90-6.

United States District Court
Northern District of California

sample of class members to interview (either with a simple random sample or by selecting respondents randomly from within subgroups, depending on what Bank of America produces about the relevant employee population, (2) conduct a small number of one-on-one interviews to determine the natural language employees use to talk about the nature of their work, and (3) design a questionnaire to determine (a) whether, how often, and how much employees worked off the clock, (b) whether, how often, and how much employees worked more than eight hours a day or 40 hours a week, (c) the experiences that caused employees to work off the clock, (d) whether, how often, and how much employees took meal-and-rest breaks, (e) work experiences that contributed to not taking meal-and-rest breaks, and (f) whether employees were told they were permitted to take meal-and-rest breaks.[26] He describes how he would (1) test the questionnaire so employees can understand it, (2) conduct the interviews, (3) analyze the data, and (4) conduct auxiliary analyses.[27] Finally, he evaluates the proposed survey.[28]

In a second report, Dr. Krosnick responds to the Bank's expert report (by Robert Crandall) point by point and concludes that Mr. Crandall's critique of the proposed survey lacks merit.[29]

## 2.3    Expert Analysis of Bank of America Records

Jarrett Gorlick, a data analyst, will analyze timekeeping records, payroll records, phone records, and work schedules to determine the frequency of any violations and related payments.[30] He will compare phone records for customer-service calls to the corresponding entries in the timekeeping records and schedules and determine (1) how many meal breaks took place after more than five hours of work, (2) how many shifts greater than five hours did not have a recorded meal break, (3) how many shifts greater than five hours had a recorded meal break shorter than 30 minutes, (4) how many shifts greater than 10 hours had no recorded second rest break, (5) how

---

[26] Krosnick Report – ECF No. 90-6 at 56–57 (¶ 128(1)–(3)).

[27] *Id.* at 57–60 (¶¶ 128(4)–(14)).

[28] *Id.* at 61–74 (¶¶ 130–131) (citing Shari Diamond, "Reference Guide on Survey Research," Reference Manual on Scientific Evidence (3d ed. 2011)).

[29] Krosnick Second Report – ECF No. 120-9.

[30] Mot. – ECF No. 90 at 14–15; *see* Gorlick Decl. – ECF No. 90-5.

United States District Court
Northern District of California

many shifts greater than 3.5 hours had no recorded rest break, (6) how many shifts greater than six hours had no second recorded rest break, (7) how many shifts greater than 10 hours had no third recorded rest break, and (8) how many shifts greater than 3.5 hours had a recorded rest break shorter than 10 minutes.[31] For class members without phone-reporting records, he can use timekeeping records to determine categories one through four and also (1) how many shifts greater than six hours and up to 10 hours had a scheduled second rest break, (2) how many shifts greater than 10 and up to 12 hours had a second scheduled meal break, and (3) how many sifts greater than 12 hours had a second scheduled meal break.[32]

He can calculate class-wide damages for meal breaks and rest breaks by multiplying the shifts showing a violation (as determined by a trier of fact) by the statutory penalty of one hour at the employee's wage rate.[33] He can determine time-and-a-half and double-time overtime pay by calculating the regular rate of pay, using the appropriate multiplier, and subtracting the reported overtime pay shown on the wage statements.[34] Wage-statement class-wide damages can be assessed by multiplying the number of wage statements with a violation (as determined by a trier of fact) by the applicable statutory penalty.[35]

In a second declaration, Mr. Gorlick responds to Mr. Crandall's analysis — that a data set supported Mr. Crandall's conclusion that the Bank complied with the Labor Code — and said (among other things) that the data and documents identified in Mr. Crandall's report "are not the same or necessarily analogous to those provided to" Mr. Gorlick.[36]

---

[31] Gorlick Decl. – ECF No. 90-5 at 5 (¶¶ 10–12).

[32] *Id.* at 5–6 (¶ 13).

[33] *Id.* at 6–7 (¶¶ 18–19).

[34] *Id.* at 7 (¶ 20).

[35] *Id.* (¶ 21).

[36] Gorlick Second Decl. – ECF No. 120-10 at 9 (¶ 21).

## 3. Bank of America

Bank of America's submissions in support of its opposition to the class-certification motion include the following: (1) the organization of its operations; (2) its policies and training about recording shifts and breaks; (3) witness declarations about their jobs; and (4) expert analysis.

### 3.1 Organization of Bank Operations

Bank of America operates contact centers and financial centers.

At its contact centers (or call centers), the Bank performs customer-support operations through employees who receive and respond to telephone calls and emails from the Bank's clients or other employees.[37] Contact centers are broken into various lines and sublines of business with different divisions, subdivisions, groups, departments, and teams with different supervisory and managerial hierarchies.[38]

Its financial centers (or branches) have branch managers (called Financial Center Managers) who report to Market Leaders.[39] The Financial Center Manager and a Financial Center Assistant Manager (formerly known as an operations manager) are responsible for the management and operational functions in the branch.[40] Non-exempt employees in the branches include the assistant manager, tellers, relationship managers (or personal bankers), and relationship bankers.[41]

Its non-exempt employees in California have hundreds of unique job titles and have different responsibilities.[42] To demonstrate this, Bank of America submitted 51 declarations from class members.[43] For example, in the call centers, some employees handle inbound and outbound calls,

---

[37] Hannah Decl. – ECF No. 118-4 at 2 (¶ 3).

[38] Id.

[39] Rodibaugh Decl. – ECF No. 118-3 at 3 (¶ 5).

[40] Id.

[41] Id. (¶ 6).

[42] Id. at 3 (¶ 4) (44,502 non-exempt employees with hundreds of unique job titles).

[43] Compendium Chart – ECF No. 118-7 at 2–4; Summary Chart – ECF No. 118-8 (summarizing key facts by pin cites to the employee declarations). The court denies the plaintiffs' motion to strike the declarations, largely for the reasons that the defendants advance. Reply – ECF No. 120 at 11–12; Defendant's Objection – ECF No. 123. The court grants the defendant's motion to take judicial notice. Req. for Judicial Notice – ECF No. 118-1.

some take only inbound calls, others communicate by email, and most perform non-call-related tasks.[44] Some work with clients, and others work behind the scenes.[45] Similarly, in the branches, tellers work with customers in the teller line, relationship managers drive sales of banking products and services and meet with clients by appointment, and relationship bankers pinch hit for tellers and relationship managers as needed.[46]

### 3.2 Policies and Training About Recording Time

Non-exempt employees record their own time, including the start and end of shifts and all breaks, and Bank policy requires them to record time accurately.[47] Bank of America trains its employees on its policy, and the named plaintiffs here had that training.[48]

### 3.3 Declarations

Bank of America submitted employee declarations stating that they understood the timekeeping policies, recorded their time accurately, and were paid for all time worked.[49] Employees said that no one told them to work off the clock or overtime, and they regularly recorded (and were paid for) overtime.[50] Supervisors could correct time entries if necessary.[51]

### 3.4 Expert Evidence

Bank of America's expert is Robert Crandall.[52] He discounted the plaintiffs' experts as providing nothing more than "generic statements that 'a survey or statistical[] analysis could be done.'"[53] He reviewed a data sample, that he opines, reflects legal compliance by the Bank.[54]

---

[44] Opp'n – ECF No. 118 at 11 (summarizing depositions).

[45] *Id.*

[46] *Id.* at 3–12.

[47] Johnson Decl. – ECF No. 118-5 at 2 (¶ 3).

[48] Opp'n – ECF No. 118 at 14–15 (summarizing deposition testimony).

[49] *Id.* at 15 (summarizing declarations).

[50] *Id.* (summarizing declarations).

[51] *Id.* at 16–18 (summarizing declarations).

[52] *Id.* at 38; Crandall Decl. – ECF No. 118-2.

[53] Opp'n – ECF No. 118 at 38 (citing generally Crandall Decl. – ECF No. 118-2).

[54] *Id.*; Crandall Decl. – ECF No. 118-2 at 7–10 (¶¶ 4–9), 27–49 (¶¶ 33–57).

**ANALYSIS**

Class actions are governed by Federal Rule of Civil Procedure 23. A party seeking to certify a class must prove that all the prerequisites of Rule 23(a) are met, as well as those of at least one subsection of Rule 23(b) (and the relevant subsection here is Rule 23(b)(3)).

The following are the prerequisites of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. A court may certify a class under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

"[P]laintiffs wishing to proceed through a class action must actually *prove* — not simply plead — that their proposed class satisfies each requirement of Rule 23, including (if applicable) the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (emphasis in original) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *Comcast Corp. v. Behrend*, 569 U.S. 27, 32–33 (2013)). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied.'" *Comcast*, 569 U.S. at 33 (quoting *Wal-Mart*, 564 U.S. at 350–51). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'" *Id.* at 33–34 (quoting *Wal-Mart*, 564 U.S. at 351). "That is so because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* at 34 (quoting *Wal-Mart*, 564 U.S. at 351). Still, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citing *Wal-Mart*, 564 U.S. at 351 n.6).

1    The plaintiffs' main claims are for off-the-clock work and missed meal-and-rest-breaks, and

2    they also raise claims predicated on these claims: failure to pay final wages on time, failure to

3    provide accurate wage-and-hour statements, and unfair business practices under the UCL. They

4    move to certify classes for all claims.[55] The court grants the motion in part and certifies the

5    following narrowed classes: (1) for the off-the-clock claim, (a) all Treasury Services Advisors and

6    persons with similar job duties (in call centers) and (b) all Assistant Managers and persons with

7    similar job duties (in financial centers); and (2) for the meal-and-rest-breaks claims, all Treasury

8    Services Advisors and persons with similar job duties (in call centers). The court certifies the same

9    classes for the derivative claims for the reasons that it certifies classes for the predicate claims.[56]

### 1. Rule 23(a) Prerequisites

#### 1.1    Numerosity — Rule 23(a)(1)

Rule 23(a)(1) requires that "the class [be] so numerous that joinder of all members is

impracticable." There is no absolute minimum class size for establishing numerosity, but courts

have held that classes as small as 40 satisfy the numerosity requirement. *See, e.g.*, *In re Qualcomm*

*Antitrust Litig.*, 328 F.R.D. 280, 294 (N.D. Cal. 2018) (citing *Twegbe v. Pharmaca Integrative*

*Pharmacy, Inc.*, No. CV 12-5080 CRB, 2013 WL 3802807, at *3 (N.D. Cal. July 17, 2013)),

*appeal docketed sub nom. Stromberg v. Qualcomm Inc.*, No. 18-80135 (9th Cir. filed Oct. 11,

2018); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *13 (N.D.

Cal. Feb. 21, 2017) (citing Daniel R. Coquillette et al., 5 Moore's Federal Practice – Civil § 23.22

(2016)). The plaintiffs reasonably estimate a class size that is numerous.[57] Bank of America does

not dispute numerosity. The plaintiffs have satisfied Rule 23(a)(1)'s numerosity requirement.

---

[55] Mot. – ECF No. 90.

[56] *See Jimenez v. Allstate Ins. Co.*, No. LA CV10–08486 JAK, 2012 WL 1366052, at *1 (C.D. Cal. Apr. 18, 2012), *aff'd*, 765 F.3d 1161 (9th Cir. 2014).

[57] Mot. – ECF No. 90 at 15; Rodibaugh Decl. – ECF No. 118-3 at 3 (¶ 4).

### 1.2    Commonality — Rule 23(a)(2)

Rule 23(a)(2) requires that "there [be] questions of law or fact common to the class." "What matters to class certification is not the raising of common 'questions' — even in droves — but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (internal ellipsis and quotations omitted) (quoting *Wal-Mart*, 564 U.S. at 350). "To satisfy Rule 23(a)(2) commonality, 'even a single common question will do.'" *Id.* (internal quotations omitted) (quoting *Wal-Mart*, 564 U.S. at 359).

Here, for the narrowed classes, the facts that underlie the plaintiffs' claims are that the Bank's de facto policies (1) make off-the-clock work unavoidable because employees must work before they log in for their shifts and after they log out and (2) set performance goals that make it impossible to take meal-and-rest breaks. The court finds that there are common questions for the (narrowed) classes about Bank of America's system-wide implementation of its policies that would generate common answers apt to drive the resolution of the litigation. *Cf. In re: Autozone, Inc., Wage & Hour Emp't Practices Litig., Inc.*, --- F. App'x ---, 2019 WL 4898684, at *2 (9th Cir. Oct. 4, 2019) (affirming district court's denying certification of meal-break and off-the-clock classes because there was no evidence of a uniform policy requiring employees to work through their meal periods and because a determination of the off-the-clock subclass — given the written policy prohibiting such work — would have entailed an employee-by-employee analysis).

In *Jimenez v. Allstate Ins. Co.*, for example, the Ninth Circuit upheld the district court's certification of a class of claims adjusters for their claims of unpaid overtime, untimely payment, and unfair competition. 765 F.3d 1161, 1164–69 (9th Cir. 2014). Common questions there included the following: (1) whether class members generally worked overtime without compensation as a result of the employer's unofficial policy discouraging the reporting of overtime, its failure to reduce the class members' workload after reclassifying their jobs from exempt salaried jobs to non-exempt hourly jobs, and its policy of treating their pay as salaries "for which overtime was an 'exception;'"(2) whether the employer knew or should have known that class members were working overtime; and (3) if so, whether the employer "stood idly by"

without paying overtime. *Id.* at 1163–66; *accord Pina v. Con-Way Freight, Inc.*, No. C 10-00100 JW, 2012 WL 1278301, at *4 (N.D. Cal. Apr. 12, 2012) (common issues included whether the employer was required to ensure that employees take meal breaks, whether the employer effectively forbade employees to take breaks, and whether underpayment stemming from missed meal breaks subjected the employer to record-keeping penalties). Similarly, the plaintiffs here allege a general practice of mandated off-the-clock work and discouraging the reporting of overtime. The missed or shortened meal-and-rest breaks similarly result from Bank of America's de facto policies. In both contexts, the allegation also is that Bank of America knew about and did nothing to address the violations.

Other cases support the court's certification of the classes. For example, in *Vaquero v. Ashley Furniture Indus., Inc.*, the Ninth Circuit upheld the district court's certification of a class of sales associates who worked only on commission and were not paid for mandatory job duties (such as cleaning the store, attending meetings, and carrying furniture) unrelated to sales. 824 F.3d 1150, 1152–56 (9th Cir. 2016). The common injury there — unpaid work not related to sales — was a "'common contention' that easily 'is capable of class-wide resolution.'" *Id.* at 1154; *accord Kang*, 2019 WL 468818, at *3–4 (certifying class for claim for failure to pay minimum wages based on bank's failure to compensate home mortgage consultants for attending meetings, training, customer service, and administrative processing). Here, too, the Bank's alleged practice of requiring work before and after shifts is a common contention capable of class-wide resolution. *Cf. Ortiz v. CVS Caremark Corp.*, No. C-12-05859 EDL, 2013 WL 6236743, at *2, 9–10 (N.D. Cal. Dec. 2, 2013) (denied class certification for CVS employees who sought damages for off-the-clock work for deliveries between stores; policies mandated that employees be clocked in when they were working; no evidence of any policy requiring any off-the-clock work, and there was no evidence that the employer refused compensation for off-the-clock work (or that employees asked for it)).

To address Bank America's argument that the overtime and missed-breaks claims are too individualized to be subject to common answers and class-wide resolution,[58] the court has narrowed the plaintiffs' proposed class definition, limiting it (for the off-the-clock claim) to employees who have the same jobs as the named plaintiffs and (for the breaks claim) to call-center employees who have the same job as Ms. Frausto. The reasons are as follows.

First, the off-the-clock work for both named plaintiffs is similar: they must work off the clock (in the form of necessary start-up tasks such starting the computer) before logging in for a shift, and they must work off the clock (in the form of necessary shut-down tasks) after logging out of a shift.[59] This common contention regarding the Bank's de facto policy is capable of class-wide resolution. *See Jimenez*, 765 F.3d at 1163–69; *McLeod v. Bank of Am., N.A.*, No. 16-CV-03294-EMC, 2017 WL 6373020, at *7 (N.D. Cal. Dec. 13, 2017) (Bank's de facto policy of failing to reimburse expenses); *Stitt v. San Francisco Mun. Transp. Agency*, No. 12-cv-3704-YGR, 2014 WL 1760623, at *4–6 (N.D. Cal. May 2, 2014) (certifying class of San Francisco Muni drivers claiming four categories of uncompensated time, including start-end travel time, turn-in time, and late runs). The court limits the claim to this theory to avoid individualized determinations that otherwise would defeat commonality and predominance.

Second, the missed-breaks claim is trickier because, as the Bank argues, individualized factors such as a manager's discretion — even with claims based on workload pressure — often result in missed breaks.[60] *See Wilson v. TE Connectivity Networks, Inc.*, No. 14-cv-04872-EDL, 2017 WL 1758048, at *7 (N.D. Cal. Feb. 9, 2017) (making this point and collecting cases). But in the call-center context, and limited to jobs like Ms. Frausto's job, the claim is that the volume of calls and company policy make taking breaks impossible, despite the Bank's compliant break policy. This "impossibility" factor distinguishes call-center employees like Ms. Frausto from the hundreds of

---

[58] Opp'n – ECF No. 118 at 29–35.

[59] *See supra* Statement.

[60] Opp'n — ECF No. 118 at 31–35 (collecting cases).

other positions (and tens of thousands of employees)[61] where there are not uniform conditions of employment.[62] This strays into predominance, but for those other positions, individualized factors result in missed breaks. *Accord Mendez v. R+L Carriers, Inc.*, No. 11-2478 CW, 2012 WL 5868973, at *1, *12–13 (N.D. Cal. Nov. 19, 2012) (in case involving employer's de facto policy of not allowing truck drivers to take meal-and-rest breaks, the court certified a class of city drivers because the employer's practices across different terminals (involving similar pressures, close monitoring by dispatchers, common practices regarding scheduling, and a system for ranking speed) were "prevalent enough" to show typicality; court did not certify a class of linehaul drivers (who worked overnight on long-haul trips) because they were not subject to the same policies and practices) (citing *Pina*, 2012 WL 1278301, at *5).

Also, representative evidence (in the form of a survey) and call analysis will confirm liability and damages.[63] The ability to match phone calls to time records will generate common answers to the common issues for call-center employees with jobs like Ms. Frausto's. It will either show liability or (as the Bank's expert contends) it will show compliance with the policy. Either way, class certification is appropriate. Moreover, the individualized damages calculations do not defeat certification. *See Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).

Survey data also is appropriate for the overtime case, which is the equivalent of a donning-and-doffing case. *Senne v. Kansas City Royals Baseball Corp.*, 934 F.3d 918, 940–41 (9th Cir. 2019) (discussing *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1041–49, 1055 (2016)).

A related issue is that Bank of America contends that only Ms. Suarez made an off-the-clock claim, the plaintiffs' attempt to extend the claim to all non-exempt employees is too broad, and any claim must be limited to assistant managers at financial centers.[64] The court addressed the "too broad" argument by narrowing the class and confining the scope of the claim to necessary pre-

---

[61] Rodibaugh Decl. – ECF No. 118-3 at 3 (¶ 4).

[62] This includes Ms. Suarez's corresponding meal-and-rest-break claim for the financial-center assistant managers.

[63] Mot. – ECF No. 90 at 14; Reply – ECF No. 120 at 21.

[64] Opp'n – ECF No. 118 at 22–23.

and-post work tasks. The court's narrowed class does reach call-center employees with jobs like Ms. Suarez's job. Given the two complaints and the plaintiffs' attempt to consolidate them with one class definition, the court adopts this approach to narrow the class without requiring amendment of the complaint. *See Brown v. The Hain Celestial Group, Inc.*, No. C 11-03082 LB, 2014 WL 6483216, at *6 (N.D. Cal. Nov. 18, 2014) ("[i]t is an unremarkable feature of class actions that class definitions are refined to reflect the developing realities of a given suit").

Bank of America raises the following additional challenges to the plaintiffs' class-certification motion: (1) a court in the Central District denied class certification in a similar case called *Castillo v. Bank of America, N.A.*, No. SA CV 17-0580-DOC (KESx), 2019 WL 3818954 (C.D. Cal. July 16, 2019); and (2) the plaintiffs' expert opinions are flawed and unreliable.[65] These arguments do not change the outcome.

First, *Castillo* is distinguishable. The plaintiffs there did not submit class-member declarations or expert testimony. 2019 WL 3818954, at *7.

Second, as the plaintiffs point out, *Jimenez* involved the same proposal by Dr. Krosnick for a class-wide survey. *See Jimenez*, 2012 WL 1366052, at *13 (C.D. Cal. Apr. 18, 2012), *aff'd*, 765 F.3d at 1166; *see also DeLuca v. Farmers Ins. Exch.*, No. 17-cv-00034-EDL, 2019 WL 4307940, at *4, *7 (N. D. Cal. Sept. 11, 2019) (representative testimony and statistical sampling are appropriate when the accuracy of the employer's records are in dispute); *Villalpando v. Exel Direct Inc.*, Nos. 12-cv-04137-JCS, 13–cv-3091-JCS, 2016 WL 1598663, at *6–7 (N.D. Cal. Apr. 21, 2016) (addressing the use of statistical evidence in FLSA and wage-and-hour cases) (collecting cases); *cf. Senne v. Kansas City Royals Baseball Corp.*, 315 F.R.D. 523, 581–83 (N. D. Cal 2016) (disallowed statistical survey because variations among class members about the types of activities they engaged in distinguished the case from *Tyson Foods*). The plaintiffs here have presented a damages model that ties damages to their theory of liability. *Leyva*, 716 F.3d at 514 (addressing the Supreme Court's decision in *Comcast*). The plaintiffs' submissions at this stage are sufficient to show that a means exist for proving injury and damages on a class-wide basis.

---

[65] *Id.* at 21–22, 38.

### 1.3    Typicality — Rule 23(a)(3)

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "The test of typicality serves to ensure that 'the interest of the named representative aligns with the interests of the class.'" *Torres*, 835 F.3d at 1141 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "'Under the Rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'" *Id.* (quoting *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014)). "In this context, 'typicality refers to the nature of the claim or defense and not to the specific facts from which it arose or the relief sought.'" *Id.* (internal ellipsis omitted) (quoting *Parsons*, 754 F.3d at 685). "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon*, 976 F.2d at 508). Put another way, "[t]ypicality is present 'when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability.'" *In re Qualcomm*, 328 F.R.D. at 295 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010)).

The named plaintiffs' claims are typical of the classes' claims. The conduct they challenge — the Bank's off-the-clock and meal-and-rest-break practices — is not unique to any plaintiff.[66] Rather, Bank of America engaged in the same conduct for all members of the narrowed classes — by way of its start-up and shut-down practices for logging into and out of shifts and by how it handles calls and breaks — resulting in the same injuries. Bank of America's argument to the contrary is that Ms. Suarez relied on directives that she received from her manager, rendering her atypical.[67] The court resolved that argument by narrowing the class definition and limiting the off-the-clock claim to start-up and shut-down time.

---

[66] *Id.* at 34.

[67] *Id.* at 28.

### 1.4    Adequacy — Rule 23(a)(4)

Rule 23(a)(4) requires that "the representative parties [] fairly and adequately protect the interests of the class." "This adequacy requirement . . . 'serves to uncover conflicts of interest between named parties and the class they seek to represent' as well as the 'competency and conflicts of class counsel.'" *Espinosa v. Ahearn (In re Hyundai and Kia Fuel Econ. Litig.)*, 926 F.3d 539, 566 (9th Cir. 2019) (en banc) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 626 n.20 (1997)). "To determine legal adequacy, [courts] resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

#### 1.4.1 Conflicts

Bank of America contends that two conflicts of interest prevent class certification: (1) Ms. Frausto's separate lawsuit against the Bank for discrimination, retaliation, and wrongful termination, and (2) Ms. Suarez told other class members to take meal-and-rest breaks and never denied them breaks.[68] Neither purported conflict goes to the heart of the litigation so as to render the plaintiffs inadequate to pursue their class claims.

The Ninth Circuit has cautioned that "we do not 'favor denial of class certification on the basis of speculative conflicts.'" *Resnick v. Frank (In re Online DVD-Rental Antitrust Litig.)*, 779 F.3d 934, 942 (9th Cir. 2015) (*In re Online DVD II*) (quoting *Cummings v. Connell*, 316 F.3d 886, 896 (9th Cir. 2003)). "Nor does a district court abuse its discretion [in certifying a class] when conflicts are trivial." *Id.* (citing *Abbott v. Lockheed Martin Corp.*, 725 F.3d 803, 813 (7th Cir. 2013)). "'Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement.'" *Id.* (quoting William B. Rubenstein et al., 1 Newberg on Class Actions § 3.58 (5th ed. 2011)). "A conflict is fundamental when it goes to the specific issues in controversy." *Id.* (quoting Newberg on Class Actions § 3.58).

---

[68] *Id.* at 36–37.

First, the separate claims do not create a fundamental conflict. *See, e.g., Benedict v. Hewlett-Packard Co.*, 314 F.R.D. 457, 473 (N.D. Cal. 2016) ("individual overtime claims will not impede [the named plaintiff's] ability to represent the Colorado Class"); *Krzesniak v. Cendant Corp.,* No. C 05–05156 MEJ, 2007 WL 1795703, at *9–12 (N.D. Cal. June 20, 2007) (no conflict where named plaintiff asserted individual claims of retaliation and class wage-and-hours claims); *Satchell v. FedEx Exp.,* No. C 03-2659 SI, 2006 WL 3507913, at *1 (N.D. Cal. Dec. 5, 2006) (no conflict where named plaintiffs asserted individual claims (such as claims for retaliation) and class claims (such as claims concerning promotion, compensation, and discipline)).

Second, Ms. Suarez was an employee, not a manager, and contends that she acted at the direction of her managers.

There is no fundamental conflict here.

### 1.4.2 Adequacy of Class Representatives and Class Counsel

The plaintiffs have satisfied Rule 23(a)(4)'s adequacy requirement. They maintain that they will prosecute the case vigorously through qualified counsel on behalf of the class.[69] They have actively participated in the case, cooperated in discovery, and completed their depositions.[70]

Class counsel is adequate in all relevant respects. Under Rule 23(g)(1)(A), the court considers the following criteria: (1) counsel's work in identifying and investigating potential claims in the action; (2) counsel's experience in handling class actions; (3) counsel's knowledge of the particular law; and (4) the resources that counsel will commit to representing the class. Fed. R. Civ. P. 23(g)(1)(A). The court also "considers any other matter pertinent to counsel's ability to fairly and adequately represent the class." Fed. R. Civ. P. 23(g)(1)(B). Counsel have extensive experience in litigating class actions, they are proficient in the applicable law, and they have the necessary resources to prosecute this action to the end.[71]

---

[69] Mot. – ECF No. 90 at 34.

[70] *Id.* at 33.

[71] *See, e.g.*, Marquez Decl. – ECF No. 90-3.

## 2. Rule 23(b) Prerequisites

### 2.1 Predominance — Rule 23(b)(3)

Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." "Considering whether 'questions of law or fact common to class members predominate' begins with . . . the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011). The plaintiffs' claims are for off-the-clock work and missed meal-and-rest breaks.[72]

The predominance inquiry involves weighing and evaluating the common and individual issues in the case. *Dukes*, 564 U.S. at 360–61. The "inquiry tests whether the proposed classes are sufficiently cohesive to warrant adjudication by representation." *Tyson Food*, 136 S. Ct. at 1045 (quotation omitted). A common question "is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Id.* (internal quotation marks omitted). An individual question is "one where members of a proposed class will need to present evidence that varies from member to member. . . ." *Id.* (internal quotation marks omitted). The predominance inquiry involves the same principles that guide the Rule 23(a)(2) commonality analysis, but it "is even more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34.

Several common issues drive this case, including whether Bank of America's de facto policies (1) make pre- and post-shift off-the-clock work unavoidable because class members must take work-related steps before they can log in for their shifts and after they log out and (2) prevent or shorten meal-and-rest breaks. *Pina*, 2012 WL 1278301, at *4, 6–7. Bank of America's main argument against finding common-issue predominance is that the reasons for off-the-clock work and missed breaks ultimately rest on managers' testimony, a necessarily individualized inquiry.[73] The court resolved the concern (as discussed in the section on commonality) by narrowing the classes.

---

[72] *See* Summary-Judgment Order – ECF No. 122 at 12–13 (elements of the claims).

[73] Opp'n – ECF No. 118 at 28–29, 33–35.

The plaintiffs also have derivative claims predicated on the off-the-clock work and missed-breaks claims: failure to pay final wages on time, failure to provide accurate wage-and-hour statements, and unfair business practices under the UCL. Because the underlying claims meet the commonality and predominance requirements of Rule 23, the court certifies the derivative claims too. *Kang*, 2019 WL 468818, at *5.

## 2.2 Superiority

Rule 23(b)(3) requires a class proponent to show that the class action is the superior method for adjudicating the dispute. Factors to be considered in weighing this question include the following: (1) class members' interest in individually controlling the litigation; (2) the extent and nature of the litigation; (3) the desirability of concentrating the claims in one suit; and (4) the likely difficulties in managing the class action. Fed. R. Civ. P. 23(b)(3)(A)–(D); *Leyva*, 716 F.3d at 514.

Considering the factors, a class action is superior to individual suits. The stakes for individual class members are low, and litigation costs would exceed the value of individual litigation.[74] Bank of America's main argument is that even if liability can be addressed on a class-wide basis, individualized assessments of damages create manageability problems that preclude certification.[75] As discussed previously, they do not. *Leyva,* 716 F.3d at 513.

In sum, the plaintiffs have satisfied Rule 23(b)(3)'s superiority requirement.

## CONCLUSION

The court modifies the plaintiffs' proposed class definition and certifies narrowed classes as follows: (1) for the off-the-clock claim, (a) all Treasury Services Advisors and persons with similar job duties (in call centers) and (b) all Assistant Managers and persons with similar job duties (in financial centers); and (2) for the meal-and-rest breaks claims, all Treasury Services Advisors and persons with similar job duties (in call centers). The court certifies classes for the

---

[74] Reply – ECF No. 120 at 29.

[75] Opp'n – ECF No. 118 at 37.

derivative claims for the same reasons. As discussed in this order, the off-the-clock claim is limited to mandatory duties pre-and post-shift (in the form of logging on and off computers).

The court directs the parties to confer and to submit a joint revised class definition that complies with this order within 14 days. The parties may stipulate to extend this deadline.

**IT IS SO ORDERED.**

Dated: December 3, 2019

LAUREL BEELER
United States Magistrate Judge